IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WILLIAM YEAGER, | ) | 1:12-cv-00162-AWI-JLT |
| | ) | |
| Plaintiff, | ) | ORDER RE: MOTION FOR |
| | ) | SUMMARY JUDGMENT OR |
| v. | ) | SUMMARY ADJUDICATION |
| | ) | |
| CORRECTIONS CORPORATION OF | ) | (Doc. 29) |
| AMERICA; and DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. INTRODUCTION

Defendant Corrections Corporation of American ("Defendant" or "CCA") has filed a motion for summary judgment or summary adjudication in the alternative. For reasons discussed below, summary judgment shall be denied. Summary adjudication shall be granted in part and denied in part. Summary adjudication of the prayer for punitive damages shall be granted in favor of Defendant; summary adjudication of all other claims and causes of action shall be denied.

## II. FACTS AND PROCEDURAL BACKGROUND

The Court refers the parties to previous orders for a complete chronology of the proceedings. On

May 1, 2012, plaintiff William Yeager ("Plaintiff" or "Yeager") filed his first amended complaint for damages against defendants CCA and Does 1-5, asserting causes of action for (1) failure to engage in a good faith interactive process under California Government Code §§ 12926.1(e) and 12940(n), (2) disability discrimination in violation of the California Fair Employment and Housing Act (FEHA, Cal. Gov. Code, § 12940 et seq.) and (3) FEHA retaliation.  Plaintiff alleged as follows:

> "In or about the summer of 2003, YEAGER learned that the California City Correctional Center was advertising for Correctional Officers and YEAGER promptly applied for same.  While applying for employment in California City, including participating in on site interviews and the background investigation also conducted by personnel in California City, YEAGER learned that although the California City Correctional Center was a part of the CORRECTIONS CORPORATION OF AMERICA based in Tennessee, the California City Correctional Center was autonomous and set its own policies regarding not only the custody and detainment of prisoners, but relative to the hiring and firing of employees, including ensuring compliance with local and state statutes governing the terms and conditions of employment of Correctional Officers in California."

Plaintiff further alleged:

> "In these regards, during his Job Interview, YEAGER was advised by his Personnel Investigator as well as ASSISTANT WARDEN LEONARD LOPEZ, then conducting YEAGER's interviews, that California City like most other facilities owned by CCA, had to manage their own operations because the laws and prison contracts applicable to each facility were different across the United States and that the WARDEN, BARBARA WAGNER, was the individual who determined all policies and procedures which YEAGER would be expected to comply with at California City.  In these regards, YEAGER was further advised by ASSISTANT WARDEN LOPEZ that all disputes pertaining to his employment would be handled strictly on a local basis and that YEAGER would be expected to comply with applicable prison regulations issued by the federal Bureau of Prisons."

Plaintiff further alleged:

> "Based upon these representations, YEAGER thereafter willingly accepted the Job Offer which was extended to him in October 2003 by the CCA and commenced work at the California City facility in March 2004 where he remained a dedicated employee up until he was notified that he was being terminated on January 8, 2010 for allegedly failing to pass a pending background investigation conducted entirely by the California City Personnel Investigator, DANA MITCHELL. When terminating YEAGER, MITCHELL advised YEAGER that he failed the background due to the failure of YEAGER's ex-wife to pay a mortgage payment on the home that she was awarded.  YEAGER has reason to believe that said termination occurred because DEFENDANT CCA, by and through its managing agents in California City, refused a reasonable request from YEAGER and YEAGER's physician for the assignment of YEAGER to light duty after YEAGER sustained a severe knee injury while on duty on October 15, 2009."

2

Plaintiff further alleged:

> "In these regards, shortly after YEAGER's knee gave out and YEAGER collapsed to the ground, YEAGER started receiving medical treatment and was advised that pending surgery, YEAGER could perform limited duty.  After YEAGER and his physicians notified DEFENDANT CCA's representatives, including DIRECTOR OF SECURITY JOHN GUZMAN that YEAGER was in need of restricted duty because YEAGER could not then engage in excessive walking, prolonged standing or ladder climbing, with YEAGER in need of medical surgery, GUZMAN informed YEAGER that he had to stay at home, even though YEAGER knew DEFENDANT CCA had offered and maintained light duty assignments for Correctional Officers at its California City facility that YEAGER was fully capable of fulfilling."

Plaintiff further alleged:

> "DEFENDANT CORPORATION by and through GUZMAN, Warden BARBARA WAGNER, and its Human Resources representatives refused to engage in a good faith interactive process, despite several requests from YEAGER for not only a meeting but accommodations as well.  Not long thereafter DEFENDANT CORPORATION notified YEAGER that he was effective January 8, 2010, terminated for failing to pass the pending background investigation.  YEAGER has reason to believe that DEFENDANT CORPORATION has deliberately terminated YEAGER because DEFENDANT CORPORATION regarded YEAGER as being disabled and because it refused to engage in a good faith interactive process, especially because YEAGER protested to JOHN GUZMAN and others that DEFENDANT CORPORATION should be obligated to accommodate YEAGER's disabilities.  DEFENDANT CCA similarly refused to reinstate YEAGER following YEAGER's receipt of Arthroscopic Surgery, despite requests for reinstatement."

On February 15, 2013, Defendant filed its motion for summary judgment or summary adjudication in the alternative pursuant to Federal Rule of Civil Procedure 56, contending the absence of triable issues entitles it to judgment as a matter of law.  On March 14, 2013, Plaintiff filed his opposition to Defendant's motion.  Defendant filed its reply to Plaintiff's opposition on March 25, 2013.

### III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the

3

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325).  If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538.  A court ruling on a motion for summary judgment must construe all facts and inferences in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Even if the motion is unopposed, the movant is not absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries, Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and other supporting materials show the movant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2), (3).

## IV. DISCUSSION

***A. Plaintiff's first cause of action (failure to engage in good faith interactive process)*** – As a threshold matter, Defendant moves for summary adjudication of Plaintiff's first cause of action for failure to engage in the good faith interactive process pursuant to California Government Code sections 12926.1(e) and 12940(n).  Section 12940, subdivision (n) provides it shall be an unlawful employment practice for employers "to fail to engage in a timely, good faith interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or

known medical condition." Cal. Gov. Code, § 12940, subd. (n).  Section 12926.1, subdivision (e) provides, "The Legislature affirms the importance of the interactive process between the . . . employee and the employer in determining a reasonable accommodation, as this requirement has been articulated by the Equal Employment Opportunity Commission in its interpretive guidance of the federal Americans with Disabilities Act of 1990." Cal. Gov. Code, § 12926.1, subd. (e).  Under this cause of action, Plaintiff, incorporating previous allegations by reference, alleges Defendant violated its statutory obligation to "engage in a good faith interactive process to achieve a reasonable accommodation of employees with . . . medical ailments and known disabling conditions." Defendant now contends summary adjudication must be granted due to an absence of triable issues. Specifically, Defendant contends Plaintiff cannot establish an actionable claim for failure to engage in the interactive process because he cannot prove that a reasonable accommodation was possible.

"' ' "[T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees" with the goal of "identify[ing] an accommodation that allows the employee to perform the job effectively." [Citation.] . . . [F]or the process to work "[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." [Citation.] When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to " 'isolate the cause of the breakdown . . . and then assign responsibility so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.' [Citation.]" [Citation.]' [Citation.]" *Nadaf-Rahrov v. Neiman Marcus Group, Inc.,* 166 Cal.App.4th 952, 984, 83 Cal.Rptr.3d 190 (2008). "[T]he availability of a reasonable accommodation (i.e., a modification or adjustment to the work place that enables an employee to perform the essential functions of the position held or desired) is necessary to a section 12940(n) claim." *Id.* at 983.  Thus, "[t]he employee who brings a section 12940(n) claim bears the burden of proving a reasonable accommodation was available before the employer can be held liable under statute . . . ." *Id.* at 984.

In its motion, Defendant first argues this standard requires Plaintiff "to demonstrate *through*

*the litigation process* that a [reasonable accommodation] was available" (emphasis original) between the time Plaintiff became disabled to the time he was terminated (i.e., at the time an interactive process should have taken place).  Defendant then contends, "Plaintiff undoubtedly will not be able to satisfy this standard as he propounded no written discovery and did not take a single deposition in this case."  The Court does not agree.  The phrase "through the litigation process" originates in *Nadaf-Rahrov,* which held "[s]ection 12940(n) . . . is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify one, but the employee is able to identify a specific, available reasonable accommodation through the litigation process." 166 Cal.App.4th at 983.  The court in *Scotch v. Art Institute of California-Orange County, Inc.,* 173 Cal.App.4th 986, 93 Cal.Rptr.3d 338 (2009), subsequently explained why an employee suing under section 12940(n) need not identify a reasonable accommodation until litigation has commenced: "An employee cannot necessarily be expected to identify and request all possible accommodations [at the time the interactive process should have occurred] because ' " '[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have . . . .' " ' [Citation.] . . . [¶] . . . [I]t would be unfair to expect an employee in the workplace to unilaterally identify reasonable accommodations, but in litigation, the employee has discovery tools available to learn what accommodations might have been discussed during the interactive process." *Id*. at 1018.  Defendant has provided no authority – and the Court's research reveals no authority – to support the proposition that, as it suggests, evidence of reasonable accommodations can only be uncovered through its responses to discovery requests or depositions of its representatives and/or persons most knowledgeable.  In alluding to this proposition, Defendant conflates discovery requests propounded on defendants with the litigation process.  Discovery requests propounded on defendants are part of litigation, but litigation does not consist solely of such discovery.  Defendant's unarticulated request Plaintiff not be permitted to identify what might have been reasonable accommodations without

1   reference to Defendant's discovery responses is counterintuitive and would force section 12940(n)

2   claimants like Plaintiff to rely exclusively on discovery responses of adverse parties in attempting

3   to create issues of material fact. This contravenes the spirit of fair litigation and the Court rejects it.

4       Having reviewed the pleadings of record and all competent and admissible evidence

5   submitted, the Court finds sufficient evidence from which a reasonable trier of fact could conclude

6   reasonable accommodations were available to Plaintiff. " 'Reasonable accommodation' is defined

7   in [ ] FEHA and its implementing regulations [ ] by way of example." *Nadaf-Rahrov, supra,* 166

8   Cal.App.4th at 972.   In this respect, California Government Code section 12926, subdivision (o)

9   provides: " 'Reasonable accommodation' may include either of the following: [¶] (1) Making

10  existing facilities used by employees readily accessible to, and usable by, individuals with

11  disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant

12  position, acquisition or modification of equipment or devices, adjustment or modifications of

13  examinations, training materials or policies, the provision of qualified readers or interpreters, and

14  other similar accommodations for individuals with disabilities." Cal. Gov. Code, § 12926, subd. (o).

15  "This definition is virtually identical to the ADA's [Americans with Disabilities Act's] statutory

16  definition of the term, which is also by way of example.  (42 U.S.C. § 12111(9); *see also* 29 C.F.R.

17  § 1630.2(o)(2).)" *Nadaf-Rahrov, supra,* at p. 973.   Finding the regulations interpreting a federal

18  statute to be instructive in interpreting a state statute where the latter is modeled on the former, the

19  *Nadaf-Rahrov* court, relying principally on the federal regulations implementing the equal

20  employment provisions of the ADA, *see* 29 C.F.R. § 1630.2 et seq., and the Equal Employment

21  Opportunity Commission's (EEOC's) interpretive guidance of the ADA, *see* 29 C.F.R. Pt. 1630,

22  App., § 1630.9, further defined "reasonable accommodation" to mean "a modification or adjustment

23  to the workplace that enables the employee to perform the essential functions of the job held of

24  desired." *Id.* at 974.   Evidence to suggest there were reasonable accommodations available to

25  Plaintiff satisfying the section 12926, subdivision (o) examples and the *Nadaf-Rahrov* definition may

26  be found in part in the declaration of Mark Smith, a deputy sheriff currently employed by the Inyo

27

28                                                  7

County Sheriff's Department who was previously employed as a correctional officer at Defendant's

California City facility from March 2005 through December 2007. In his declaration, Smith testifies:

> "There were and still are ten Units [at CCA's California City facility] which housed 256 inmates per Unit, with each Unit having a Unit Control area also known as a 'bubble.' Prisoner access to the bubble is denied, while the 'bubble' officer remains in the 'bubble' for the entire shift . . . . [T]he Segregation Housing Unit where William Yeager and I both worked when I was employed, had a minimum three floor officers . . . . In addition to the 10 Unit Control work stations, there was also an enclosed Central Control work station which prisoners were excluded from as well. CCA also employed a Correctional Officer to sit at the Front Lobby Desk."

Smith further testifies:

> "I was personally aware that Light Duty Assignments to the ten 'bubbles,' as well as to Central Control or the Front Lobby Desk were routinely given to officers who injured themselves at work or became disabled, including Sergeant Tom Llewelyn and Correctionals Officers Debra Mell, Samuel Chavez, Barbara Odelbraski, as well as Donna Stump and her husband who was also employed as a Correctional Officer. These individuals were assigned on a daily basis to the 'bubble' and did not rotate with other Correctional Officers during the duration of their light duty assignments. Because there were three shifts at California City, that meant there were at a minimum 30 'Bubble' positions that had to be staffed by Correctional Officers regardless of whether they were on Light Duty or Regular Duty."

Smith's testimony suggests there were available positions at Defendant's California City facility for which the essential functions could have been performed by Plaintiff despite his medical limitations.

In response, Defendant contends it could not have placed Plaintiff into a segregation control unit (i.e., "bubble") position because those positions had at least one essential function – direct inmate contact – that Plaintiff could not perform with or without an accommodation. In support of this contention, Defendant refers to the declaration of its California City facility warden, Barbara Wagner, who testifies as follows: "The segregation control unit positions . . . require that two employees rotate positions and, as a result, require the correctional officers perform inmate counts necessitating contact with inmates. Accordingly, a correctional officer in that position must have the ability and capacity to perform essential safety functions, including physically restraining an inmate if necessary. There are no control unit positions that do not involve contact with inmates." In light of Smith's testimony that (1) the bubble included a work station from which inmates were excluded and (2) light duty assignments in the bubble were routinely given to officers who were

8

1   injured and/or disabled and presumably could not have physically restrained an inmate, Wagner's

2   testimony simply makes the question of whether direct inmate contact was an essential function of

3   the bubble positions a controverted issue to be resolved by the trier of fact.  The Court notes Smith

4   further testified Defendant employed correctional officers whose entire assignment was to patrol the

5   perimeter of the California City facility while driving a vehicle.  Smith, who at one point performed

6   the perimeter assignment, also testified the assignment did not require contact with inmates unless

7   a prisoner tried to escape, and that Defendant prided itself on never having had any inmates escape.

8   The conflicting testimony on the bubble positions and the absence of evidence in the record to

9   suggest what the essential functions of the patrol assignment were create triable issues in this case.

10      The case of *Stone v. City of Mount Vernon,* 118 F.3d 92 (2d Cir. 1997), is instructive as to

11   why.  Matthew Stone, a firefighter employed by the City of Mount Vernon, New York ("the city"),

12   brought an action against the city and its fire commissioner pursuant to the ADA and the

13   Rehabilitation Act of 1973 alleging the defendants refused to assign him to a position in one of the

14   fire department's two light duty bureaus after an off-duty accident left him a paraplegic.  *Id*. at 93.

15   Stone had previously been assigned to fire-suppression duties, including extinguishing fires, entering

16   burning buildings and performing rescues.  *Id.*  On motion for summary judgment, the defendants,

17   relying principally on the affidavits of the commissioner, argued all of the department's active

18   firefighters were required to be available and ready to perform fire-suppression duties regardless of

19   the bureau to which they were assigned.  *Id*. at 94.  In opposition Stone argued fire suppression was

20   not an essential function of the positions in either light duty bureau and submitted as evidence the

21   deposition testimony of two former firefighters who essentially averred they had never been called

22   on to perform fire-suppression duties in all their years of light duty assignments.  *Id*. at 95.  The trial

23   court, apparently relying on the commissioner's affidavits, granted the defendants' motion. *Id*. at 96.

24      The Second Circuit reversed, finding fire suppression was not necessarily an essential

25   function of the positions Stone sought.  *Stone, supra,* 118 F.3d at 99-101.  Acknowledging that an

26   " 'employer's judgment as to which functions are essential[ ]' . . . is highly relevant evidence" under

27

28                                                         9

the ADA's implementing regulations, *see* 29 C.F.R. § 1630.2(n)(3)(i)-(vii), the court determined there was nevertheless sufficient evidence in the record to controvert the commissioner's opinion that fire-suppression duty was an essential function of a firefighter assigned to a light duty bureau: "[T]here are no job descriptions and no collective bargaining agreement provisions with respect to those bureaus that require fire-suppression activities.  And although the [district] court credited [the commissioner's] opinion that in the event of a major fire the Department needed to be able to call upon 'every person in the Fire Department to respond' [citation], . . . , as a matter of practice, firefighters assigned to [the light duty bureaus] simply have not been called upon to fight fires. Whenever the Department's own on-duty force has appeared to be insufficient to suppress a fire, the Department's standard practice has been to call in mutual-aid fire companies from neighboring towns, not to request that [light duty bureau] members suit up to suppress the fire . . . .  Plainly, therefore, it cannot be said that the reason the [light duty bureau] positions exist is to perform the fire-suppression function, or that the incumbents are assigned to those positions because of their ability to perform a fire-suppression function." *Stone, supra,* 118 F.3d at 100.  Observing a function is not " 'essential' " to a position if it is " 'marginal,' " the court found the evidence neither former nor incumbent light duty firefighters had ever been required to engage in fire-suppression activities was sufficient to create triable issues whether such activities were marginal to those positions. *Id.* In this case, as with the extent of the fire suppression evidence in *Stone*, the evidence disabled officers were assigned to light duty positions in the bubble (which, critically, included a work station from which inmates were excluded) suggests the ability to engage in direct inmate contact was not an essential function of all bubble positions, as Defendant contends.  Defendant's failure to directly address the perimeter patrol assignment mentioned by Smith further means the Court cannot now conclude the perimeter assignment had direct inmate contact as one of *its* essential functions.  Even if the Court were to accept the (intuitive) proposition that subduing escaping inmates – i.e., a form of direct inmate contact – was *a* function of the perimeter assignment, the complete absence of evidence in the record to suggest inmates have escaped or even attempted to escape from

1  Defendant's California City facility would, under *Stone,* in turn suggest that, as a practical matter,

2  patrol officers simply have not been called upon to subdue inmates and that subduing inmates is

3  merely a marginal – as opposed to essential – function of officers assigned to perimeter patrol detail.

4       The circumstances in *Stone* (and the evidentiary showing made therein) stand in stark

5  contrast to those in *Kees v. Wallenstein,* 161 F.3d 1196 (1998).  The plaintiffs in *Kees* were former

6  King County (Wash.) corrections officers who filed suit against the county and officials from the

7  county's Department of Adult Detention ("DAD") alleging they were removed from their positions

8  in violation of the ADA after suffering various impairments that prevented them from having direct

9  contact with inmates.  *Id*. at 1197-98.  Initially, the DAD accommodated the plaintiffs' limitations

10  by assigning them exclusively to the "control room," a light duty monitoring and inspection post.

11  In 1990, Arthur Wallenstein became director of the DAD.  With the assistance of the county's Office

12  of Human Resource Management ("OHRM"), Wallenstein set out to determine whether certain

13  corrections officers who had been placed on light duty for extended periods of time had conditions

14  that were permanent.  Plaintiffs, who were presumably included in this group, informed Wallenstein

15  their conditions were permanent and no reasonable accommodation would allow them to have direct

16  contact with inmates.  After determining direct inmate contact was an essential function of the

17  corrections officer position, OHRM and Wallenstein separated the plaintiffs from their positions.

18  Plaintiffs were later terminated after efforts to place them in other positions were unsuccessful.  *Id*.

19       The district court granted summary judgment in favor of the defendants and the Ninth Circuit

20  affirmed.  *Kees, supra,* 161 F.3d at 1198-99.  The court found summary judgment was proper

21  because direct inmate contact – which the plaintiffs alleged their impairments prevented them from

22  performing, *id.* at 1197 – was an essential function of the corrections officer position that plaintiffs

23  could not perform even with an accommodation: "The record indicates that both the employer and

24  the written job description identify inmate contact as a fundamental duty.  Although corrections

25  officers assigned to the control room are not expected to have inmate contact on a regular basis,

26  plaintiffs acknowledged that some incidental contact is inevitable.  Further their ability to restrain

27

28                                  11

inmates during an emergency is critical to jail security.  In fact, several corrections officers testified that jail safety is currently jeopardized by [plaintiffs'] inability to respond to emergencies.  Finally, the relevant collective bargaining agreement indicates that King County corrections officers are expected to rotate among several positions, most of which require inmate contact." *Id*. at 1199.  The circumstances in this case are clearly more apposite to those in *Stone* than *Kees*.  Unlike the evidence in *Kees*, the evidence here does not suggest inmate contact is a fundamental duty of officers assigned to the bubble; that incidental contact between bubble officers and inmates would be inevitable; or that jail safety might have been compromised by Plaintiff's inability to engage in direct inmate contact.  Furthermore, Wagner's testimony bubble officers would necessarily come into contact with inmates because they had to rotate positions and were thus required to perform inmate counts (a tenuous connection, in the Court's view) is contradicted by Smith's testimony bubble officers did not rotate with other officers during their assignments.  Accordingly, the Court cannot find inmate contact was an essential function of the positions at issue.  In light of this conclusion, the Court need not address Defendant's contention an employer is not required to transfer a job's essential functions to another employee to accommodate a disabled employee.  Based on the foregoing, summary adjudication of the first cause of action for failure to engage in an interactive process shall be denied.

***B. Plaintiff's second cause of action (disability discrimination)*** – Defendant further moves for summary adjudication of Plaintiff's second cause of action for disability discrimination in violation of FEHA.  Under this cause of action, Plaintiff, incorporating previous allegations by reference, alleges: "[I]mmediately upon onset of YEAGER's disabling condition, YEAGER's ability to engage in major life activities seriously impacted YEAGER's mobility."  Plaintiff further alleges as follows:

> "DEFENDANT CORPORATION has engaged in various material adverse employment actions against YEAGER which materially altered the terms and conditions and privileges of YEAGER'S employment, including not only by firing YEAGER but by denying light duty assignments purportedly available to other employees . . . . DEFENDANT CORPORATION's representatives took actions against YEAGER partially because of YEAGER's disabilities and with an intention of deliberately aggravating YEAGER's disabilities and recovery therefrom."

1  Defendant now contends summary adjudication of this cause of action must be granted because it

2  had a legitimate, nondiscriminatory reason for taking adverse employment actions against Plaintiff.

3  FEHA provides in pertinent part it is an unlawful employment practice "[f]or an employer,

4  because of the . . . physical disability . . . of any person, to refuse to hire or employ the person or .

5  . . discharge the person from employment . . . or to discriminate against the person in compensation

6  or in terms, conditions or privileges of employment."  Cal. Gov. Code, § 12940, subd. (a).  "[T]he

7  elements of a claim for employment discrimination in violation of section 12940, subdivision (a),

8  are (1) the employee's membership in a classification protected by the statute; (2) discriminatory

9  animus on the part of the employer toward members of that classification; (3) an action by the

10  employer adverse to the employee's interests; (4) a causal link between the discriminatory animus

11  and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action

12  and the damage." *Mamou v. Trendwest Resorts, Inc.,* 165 Cal.App.4th 686, 713, 81 Cal.Rptr.3d 406

13  (2008).  "Proof of two of these elements – the second and fourth – is likely to depend on

14  circumstantial evidence, since they consist of subjective matters only the employer can directly

15  know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." *Id.*

16  Because of this, analysis of the discrimination cause of action must proceed under the

17  burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,*

18  411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317,

19  354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000); *see also Mamou, supra,* 165 Cal.App.4th at 713-15.

20  "Under the three-part *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing

21  a prima facie case of employment discrimination." *Earl v. Nielsen Media Research, Inc.,* 658 F.3d

22  1108, 1112 (9th Cir. 2011) (citing *Noyes v. Kelly Services,* 488 F.3d 1163, 1168 (9th Cir. 2007)).[1]

23

24      [1] A plaintiff in a FEHA employment discrimination case may create genuine issues of
material fact by offering direct or circumstantial evidence of discrimination.  *Guz, supra,* 24 Cal.4th
25  at 354.  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus
without inference of presumption.  Comments demonstrating discriminatory animus may be found
26  to be direct evidence if there is evidence of a causal relationship between the comments and the
27  adverse job action at issue." *DeJung v. Superior Court,* 169 Cal.App.4th 533, 550, 87 Cal.Rptr.3d

28                                                                13

1    "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2)

2    he was qualified for the position he sought or was performing competently in the position he held,

3    (3) he suffered an adverse employment action, such as termination, demotion, or denial of an

4    available job, and (4) some other circumstance suggests discriminatory motive." *Guz, supra,*

5    24Cal.4th at 355.  "On a disability discrimination claim, the prima facie case requires the plaintiff

6    to show 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2)

7    could perform the essential duties of the job with or without reasonable accommodations, and (3)

8    was subjected to an adverse employment action because of the disability or perceived disability.' "

9    *Wills v. Superior Court,* 195 Cal.App.4th 143, 159-60, 125 Cal.Rptr.3d 1 (2011) (quoting *Sandell*

10    *v. Taylor-Listug, Inc.,* 188 Cal.App.4th 297, 310, 115 Cal.Rptr.3d 453 (2010)).  "While the

11    plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer

12    from which one can infer, if such actions remained unexplained, that it is more likely than not that

13    such actions were based on a [prohibited] [retaliatory] criterion[.]" *Guz, supra,* at p. 355 (internal

14    citations and quotations omitted).  After the plaintiff has done so, "a presumption of discrimination

15    arises." *Id.*  The burden then "shifts to the employer to rebut the presumption by producing

16    admissible evidence . . . that its action was taken for a legitimate, nondiscriminatory reason." *Id.* at

17    355-56.  "If the employer sustains this burden, the presumption of discrimination disappears.  The

18    plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for

19    discrimination, or to offer any other evidence of discriminatory motive." *Id.* at 356 (cites omitted).

20

21    99 (2008); *accord Patten v. Wal-Mart Stores East, Inc.,* 300 F.3d 21, 25 (1st Cir. 2002) (direct

22    evidence " 'consists of statements by a decisionmaker that directly reflect the alleged animus and
bear squarely on the contested employment decision' ").  If the plaintiff chooses to rely on direct

23    evidence, the three-part test of *McDonnell Douglas* does not apply. *DeJung, supra,* 169 Cal.App.4th

24    at 550; *see Guz, supra,* 24 Cal.4th at 354 (the "*McDonnell Douglas* test reflects the principle that
direct evidence of intentional discrimination is rare, and that such claims must usually be proved

25    circumstantially.  Thus, by successive steps of increasingly narrow focus, the test allows

26    discrimination to be inferred from facts that create a reasonable likelihood of bias and are not
satisfactorily explained").  Plaintiff has not pointed to any direct evidence of discrimination in the

27    record.  Therefore, the analysis in this case proceeds under the *McDonnell Douglas* framework.

28                            14

This order of proof applies, however, only when retaliation claims are tried before a court or a jury. *See Guz, supra,* 100 Cal.Rptr.2d at 352. On summary judgment, the burdens are reversed: "A defendant seeking summary judgment must bear the initial burden of showing that the action has no merit, and the plaintiff will not be required to respond unless and until the defendant has borne that burden." *Martin v. Lockheed Missiles & Space Co.,* 29 Cal.App.4th 1718, 1730, 35 Cal.Rptr.2d 181 (1994) (internal citations and quotations omitted); *accord Department of Fair Employment and Housing v. Lucent Technologies,* 642 F.3d 728, 745 (9th Cir. 2011). Thus, " '[the employer is] required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for [the adverse employment action]." ' *Lucent Technologies, supra,* at p. 745 (citing *Avila v. Continental Airlines, Inc.,* 165 Cal.App.4th 1237, 82 Cal.Rptr.3d 440, 449 (2008)). "If the employer presents admissible evidence that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." *Caldwell v. Paramount Unified School Dist.,* 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448 (1995). "The employee can satisfy its burden by 'produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual.' " *Lucent Technologies, supra,* at p. 746 (quoting *Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215, 224, 87 Cal.Rptr.2d 487 (1999)).

As an initial matter, the Court notes Plaintiff has identified at least two discrete adverse employment actions underpinning his disability discrimination claim: (1) Defendant's denial of a light duty position in response to Plaintiff's October 16, 2009 request to be placed on light duty due to doctors' orders resulting from his most recent disability; and (2) Plaintiff's January 8, 2010 termination. Defendant fails to address the alleged denial of a light duty position in its motion. Instead, Defendant focuses solely on explaining why Plaintiff's termination could not have been based on any prohibited reason. In light of this omission, Defendant cannot meet its initial burden to demonstrate an absence of triable issues with respect to the allegation Plaintiff was denied a light

15

duty position because of his disability, and the Court may properly deny summary adjudication of the disability discrimination cause of action without proceeding to examine the circumstances surrounding Plaintiff's termination.  However, the Court shall do so in the interest of completeness.

With respect to the claim Plaintiff was terminated because of his disability, Defendant contends it had a legitimate nondiscriminatory reason for terminating Plaintiff's employment. Specifically, Defendant contends the fifth-year reinvestigation of Plaintiff's background conducted pursuant to Defendant's contract with the Bureau of Prisons revealed Plaintiff could not satisfy the Bureau of Prisons credit requisites for continued employment as a corrections officer, necessitating his termination.  In support of this contention, Defendant relies primarily on the declarations of Wagner and Dana Mitchell, the CCA investigator tasked with the fifth-year reinvestigations of current CCA employees.  Mitchell, who investigated Plaintiff, testifies as follows in his declaration:

> "Pursuant to contract with the Federal Bureau of Prisons ('BOP'), CCA operated the California City Correctional Center from 2000 to 2010. [¶] As part of CCA's contract with the BOP, correctional officers must undergo and successfully complete an initial background check. [¶] Correctional officers were also required to undergo a reinvestigation process every five years as mandated by CCA's contract with the BOP. [¶] All correctional officers, and all CCA employees, are uniformly required to undergo the initial background check and the reinvestigation every five years."

Mitchell further testifies:

> "In 2009 and 2010, part of the background check and the reinvestigation included a credit check and required that correctional officers cannot have debts in collections in order to successfully pass. [¶] According to the terms of CCA's contract with the BOP, an employee has 180 days to either cure an item in collections or to prove they have established and are current with an approved payment plan. [¶] CCA cannot retain a correctional officer who cannot satisfy the BOP background requisites and standards."

Mitchell further testifies:

> "I am responsible for completing the initial background screening process for new employees as well as the five year reinvestigations for current employees.  As part of that process, I maintain an investigation file in connection with the background screening process for new and existing employees.  My standard practice, which I always adhere to, is to include all documents related to the process in the investigation file. [¶] I created, maintained, and I am familiar with the investigation file in connection with Plaintiff William Yeager's initial background screening process and his five year reinvestigation in 2009."

Mitchell further testifies:

16

> "In March 2009, CCA initiated the process to begin the five year reinvestigation involving Plaintiff's background and credit. [¶] The preliminary results of the five year investigation involving Plaintiff's credit were outlined in a memorandum dated May 28, 2009 which memorialized that Plaintiff had significant debts to seven different creditors in collections totaling approximately $3,668 . . . . [¶] In the May 28, 2009 memorandum, Defendant clearly instructed that Plaintiff must pay and cure the credit issues by June 30, 2009 or he would be subject to corrective action up to and including termination. [Citation.]"

Mitchell further testifies:

> "On or about June 20, 2009, Plaintiff submitted a memorandum to CCA requesting additional time to rectify his credit issues. The memorandum indicated that Plaintiff did not have the money to correct all of the collections issues and that he would be taking a loan from his 401k. [Citation.] [¶] Then on or about July 14, 2009, Plaintiff submitted another memorandum to CCA again requesting additional time to rectify items in collections. [Citation.] [¶] . . . [¶] . . . [O]n or around January 8, 2010, Plaintiff was terminated due to his failure to satisfy the requisites of the BOP five year reinvestigation background check."

Wagner affirms this reason in her declaration, stating: "I terminated Plaintiff on . . . January 8, 2010 because he could not satisfy the credit requisites to pass the five year background reinvestigation."

Wagner's and Mitchell's testimony establishes Plaintiff's termination was based not on any prohibited reason, but on legitimate, nonretaliatory factors. *See Guz, supra,* 24 Cal.4th at 357. "A reason is ' "legitimate" ' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination." *Reid v. Google, Inc.,* 50 Cal.4th 512, 520 n. 2, 113 Cal.Rptr.3d 327, 235 P.3d 988 (2010) (citing *Guz, supra,* 24 Cal.4th at 358) (emphasis omitted). The evidence shows Defendant determined Plaintiff did not satisfy the credit requisites for continued employment as a corrections officer. "[F]ailure to meet a required condition for employment" is a legitimate, nondiscriminatory reason for terminating an employee. *Strong v. Orkand Corp.,* 83 Fed.Appx. 751, 754 (6th Cir. 2003) (unpublished) (plaintiff's failure to obtain favorable security clearance required as condition of employment legitimate, nondiscriminatory reason for defendant's decision to terminate plaintiff's employment). Accordingly, the burden shifts to Plaintiff to offer evidence of discriminatory motive or show the reason for termination was pretext for discrimination.

"A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing

17

that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl, supra,* 658 F.3d at 1112-13 (citing *Chuang v. University of California Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir. 2000)). "When evidence of pretext is circumstantial, rather than direct," as in this case, "the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Earl, supra,* 658 F.3d at 1113 (citing *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998)). " 'An employee in this situation can not simply show the employer's decision was wrong, mistaken or unwise.' 'Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons.' " *Lucent Technologies, supra,* 642 F.3d at 746 (citing *Morgan v. Regents of the Univ. of Cal.,* 88 Cal.App.4th 52, 105 Cal.Rptr.2d 652, 670 (2000)). Having reviewed the pleadings of record and all competent and admissible evidence, the Court finds a reasonable trier of fact could infer Plaintiff's termination was motivated by discriminatory animus. The Court notes the following testimony from Plaintiff's declaration:

> "On October 15, 2009, while reporting to work in the Special Housing Unit where I was assigned to work in the 'Bubble,' my knees gave out completely. Two Correctional Officers, Christy Wood and James Adams, witnessed the event and helped me into the 'Bubble' where I awaited transportation to the High Desert Medical Group in Lancaster, California."

Plaintiff further testified:

> "Dr. Bautista placed an immobilizer on my knee, provided me with crutches and indicated that I could return to work the next day with limitations. After being seen by Dr. Bautista, I returned to CCA in the vehicle which transported me to Lancaster and then met with my assigned Lieutenant, Lt. Garrett and he in turn told me I had to speak directly with Chief Guzman and provide Chief Guzman with my Work Status Report. That report and all subsequent ones . . . , including for October 19, 22 and 29, 2009, as well as from my Orthopedic Specialist, Dr. Sobeck, dated November 23, 2009, were personally turned in by me to Chief Guzman. When I told Chief Guzman that Dr. Bautista wanted me to be placed on Light Duty on October 16, 2009, Chief Guzman replied that there was 'no such thing as Light Duty.' I had previously been provided light duty on February 6, 2006 for a hand injury and again in July 2008 because I was experiencing high blood pressure."

Plaintiff further testified:

"I reminded Chief Guzman that I had previously had Light Duty . . . . Chief Guzman was abrupt and told me to go home and rest. I complied. I returned to the Prison with Medical Reports also repeating my doctor's requests for light duty on October 19, 22 and 29 and each time spoke with Chief Guzman again pleading for Light Duty . . . . Chief Guzman continued to state, 'there is no such thing as light duty' . . . . After hearing these remarks on several occasions, I finally went over Chief Guzman's head and sought to speak to Assistant Warden Lopez as well as Warden Barbara Wagner. I told both Wardens about my need for Light Duty and Chief Guzman's refusal to place me on same. Both at separate times told me the matters were in the hands of Chief Guzman and that I should redirect my inquiries to him."

Construed in the light most favorable to Plaintiff, the foregoing testimony suggests that by the end of October 2009, Defendant was on notice Plaintiff had been disabled and had requested light duty.

This testimony, viewed in isolation, would appear to establish simply Defendant knew or should have known in October 2009 Plaintiff had been disabled. Problematically for Defendant, sufficient evidence exists in the remainder of the record for a reasonable trier of fact to conclude Defendant terminated Plaintiff precisely because it became aware of Plaintiff's disability. As noted above, Defendant relies on Wagner's and Mitchell's declarations for the assertion the results of Mitchell's fifth-year reinvestigation of Plaintiff showing Plaintiff failed to meet the Bureau of Prisons credit requisites was the impetus behind Wagner's decision to terminate Plaintiff. But contrary to Defendant's implication, the evidence suggests Plaintiff's reinvestigation was never actually completed by Mitchell. The reinvestigation checklist maintained by Mitchell (submitted with Plaintiff's opposition and presumably produced in discovery) shows the last action item Mitchell completed as part of his investigation – receiving and reviewing the results of Plaintiff's limited background investigation (LBI) request – occurred on October 14, 2009. The checklist suggests, however, that at least two more action items – preparing and submitting a case summary to the warden and obtaining final approval from the Bureau of Prisons – were required to be performed by the investigator before a reinvestigation of an employee could be deemed complete. These action items were neither dated nor initialed by Mitchell on the checklist, and Defendant provides no evidence to suggest Mitchell even did them. Based on this, a reasonable trier of fact could conclude Mitchell suspended the reinvestigation sometime in October 2009. The fact it appears Mitchell suspended the reinvestigation in October 2009, at or around the time Plaintiff

informed Defendant he had become disabled, could in turn lead a trier of fact to conclude (1) Defendant determined completing the reinvestigation of Plaintiff was unnecessary because it was going to terminate him anyway regardless of the reinvestigation's results, and that (2) Wagner terminated Plaintiff not because of the reinvestigation results but because of his disability.  Such a finding would necessarily imply Defendant's proffered reason for the termination was pretextual. Based on the foregoing, summary adjudication of the discrimination cause of action must be denied.

**C. Plaintiff's third cause of action (retaliation)** – Defendant further moves for summary adjudication of Plaintiff's third cause of action for retaliation.  Under this cause of action, Plaintiff, incorporating previous allegations by reference, alleges Defendant terminated him in retaliation for having sought a good faith interactive process and an accommodation for his disability.  FEHA provides it is an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov. Code, § 12940, subd. (h).  "The elements of a claim for retaliation in violation of section 12940, subdivision (h), are . . . (1) the employee's engagement in a protected activity, i.e., 'oppos[ing] any practices forbidden under this part'; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation."  *Mamou, supra,* 165 Cal.App.4th at 713.  As with the disability discrimination cause of action, analysis of the retaliation cause of action proceeds under the *McDonnell Douglas* burden-shifting framework.  *See id.* at 713-15; *see also Joaquin v. City of Los Angeles,* 202 Cal.App.4th 1207, 1219-22, 136 Cal.Rptr.3d 472 (2012). Defendant now contends summary adjudication must be granted on the same ground advanced by Defendant in response to Plaintiff's disability discrimination claim – namely, Plaintiff's fifth-year reinvestigation revealed he could not comply with the Bureau of Prisons credit requisites and thus Defendant had a legitimate, nondiscriminatory (and non-retaliatory) reason for terminating Plaintiff's

employment.   Problematically for Defendant, as discussed above, the Court has already found

sufficient evidence in the record from which a reasonable trier of fact could conclude the foregoing

reason was simply pretext for Defendant to engage in a FEHA violation.   Accordingly, summary

adjudication of the retaliation cause of action cannot be granted in favor of Defendant.

***D. Prayer for punitive damages*** – Lastly, Defendant moves for summary adjudication of Plaintiff's

prayer for punitive damages, contending there is no evidence to suggest any of its officers, directors

or managing agents engaged in oppressive, fraudulent or malicious conduct in connection with any

adverse employment actions against Plaintiff.   "In an action for breach of an obligation not arising

from contract, where it is proven by clear and convincing evidence that the defendant has been guilty

of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages

for the sake of example and by way of punishing the defendant."   Cal. Civ. Code, § 3294, subd. (a).

"An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an

employee of the employer, unless the employer had advance knowledge of the unfitness of the

employee and employed him or her with a conscious disregard of the rights or safety of others or

authorized or ratified the wrongful conduct for which the damages are awarded or was personally

guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge*

*and conscious disregard, authorization, ratification or act of oppression must be on the part of an*

*officer, director, or managing agent of the corporation*."   *Id*., § 3294, subd. (b) (emphasis added).

The three causes of action asserted against Defendant, all of which remain, effectively arise

under FEHA.   Punitive damages are recoverable for FEHA violations.   *Commodore Home Systems,*

*Inc. v. Superior Court,* 32 Cal.3d 211, 220, 221, 185 Cal.Rptr. 270, 649 P.2d 912 (1982) ("[I]n a

civil action under [ ] FEHA, all relief generally available in noncontractual actions, including

punitive damages, may be obtained").   FEHA imposes a negligence standard of liability on

employers for acts of discrimination committed by an employee who is not an agent or supervisor

and a strict liability standard for acts of discrimination committed by an employee who is an agent

21

or a supervisor. *See State Dept. of Health Services v. Superior Court,* 31 Cal.4th 1026, 1041-42, 6 Cal.Rptr.3d 441, 79 P.3d 556 (2003). Irrespective of the foregoing observation, the Court further notes a corporation like Defendant "is a legal fiction that cannot act except through its employees or agents[.]" *Kight v. CashCall, Inc.,* 200 Cal.App.4th 1377, 1392, 133 Cal.Rptr.3d 450 (2011). In light of these principles, Plaintiff's causes of action necessarily constitute torts "based upon acts of an employee of the employer," Cal. Civ. Code, § 3294, subd. (b), such that his prayer for punitive damages is governed by that subdivision. Because Defendant is a corporation, the evidence must demonstrate an officer, director or managing agent of Defendant committed, authorized or ratified an act of malice, oppression or fraud to create a genuine issue of material fact on punitive damages.

Wagner, assistant warden Leonard Lopez, Mitchell and Guzman are the only employees of Defendant alleged to have taken adverse employment actions against Plaintiff. (In his opposition, Plaintiff contends certain "Human Resources representatives" also bore responsibility for the alleged misconduct, but fails to identify who these individuals were.) It is essentially undisputed that none of the four aforementioned individuals were officers or directors of Defendant. Thus, a triable issue on punitive damages could arise only if the evidence showed they were working for Defendant in managing agent capacities. Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds no evidence in the record to show this was the case.

"[B]y selecting the term 'managing agent,' and placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages." *White v. Ultramar, Inc.,* 21 Cal.4th 563, 573, 88 Cal.Rptr.2d 19, 981 P.2d 944 (1999). "[T]he Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be

considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." *White, supra,* 21 Cal.4th at 577.  In *White*, a wrongful termination case, the California Supreme Court found Lorraine Salla, Ultramar's zone manager and the employee who fired the plaintiff, to be a managing agent of Ultramar because she (1) managed eight stores and at least sixty-five employees, (2) had individual store managers report to her and (3) reported to department heads in the corporation's retail management department: "Salla's supervision of plaintiff and her ability to fire him alone were insufficient to make her a managing agent.  Nonetheless, viewing all the facts in favor of the trial court judgment, . . . Salla was a managing agent . . . [¶] . . . [¶] The supervision of eight retail stores and sixty-five employees is a significant aspect of Ultramar's business.  The testimony of Salla's superiors establishes that they delegated most, if not all, of the responsibility for running these stores to her.  The fact that Salla spoke with other employees and consulted the human resources department before firing plaintiff does not detract from her admitted ability to act independently of those sources.  In sum, Salla exercised substantial discretionary authority over vital aspects of Ultramar's business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy.  In firing White for testifying at an unemployment hearing, Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of Ultramar's business." *White, supra,* 21 Cal.4th at 577.

Plaintiff has not identified – and the Court has been unable to locate – any evidence in the record to suggest Wagner, Lopez, Mitchell or Guzman exercised (or had the ability to exercise) substantial discretionary authority over decisions that ultimately determined corporate policy in some aspect of Defendant's business.  In his opposition, Plaintiff suggests the aforementioned individuals were managing agents because the discretion exercised by them necessarily resulted in the "ad hoc formulation of policy," *White, supra,* 21 Cal.4th at 579 (internal quotations and citations omitted),

contending they "clearly altered CCA corporate policies with respect to Financial Policies . . . and BOP [Bureau of Prisons] Background Investigations" in concluding Plaintiff should be terminated for failing to satisfy the standards set by the Bureau of Prisons.  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court does not agree.  At most the evidence, even when viewed in the light most favorable to Plaintiff, suggests the employees charged with conducting and reviewing Plaintiff's 5-year background reinvestigation might have mis-characterized his financial history to justify terminating him under the financial responsibility provisions of Defendant's contract with the Bureau of Prisons.  While such conduct could arguably constitute malice or oppression, it hardly serves to establish those employees were empowered to make ad hoc policy decisions in a manner sufficient to transform them into Defendant's managing agents, which is the other prerequisite for the recovery of punitive damages against Defendant. Compare *Rangel v. American Medical Response West,* slip copy, 2013 WL 1785907 (E.D.Cal. 2013) (unpublished), at *26-*35 (and authorities cited) (finding triable issue whether human resources manager who investigated and later terminated plaintiff for purported violation of corporation's workplace conduct policy was managing agent of corporation for purpose of punitive damages liability where evidence suggested manager, in creating and administering local ad hoc policy for investigation and termination of employees despite existence of contrary official corporate policy, further instituted implicit policy to terminate employees who reported sexual harassment). Accordingly, summary adjudication of the punitive damages claim shall be granted for Defendant.

**V. DISPOSITION**

Based on the foregoing, Defendant's motion for summary judgment is DENIED.

Defendant's motion for summary adjudication is granted in part and denied in part.  Summary adjudication of the prayer for punitive damages is GRANTED in favor of Defendant; summary adjudication of all other claims and causes of action is DENIED.

IT IS SO ORDERED.

Dated:   May 7, 2013                                    _____
                                                                        SENIOR  DISTRICT  JUDGE

25